UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PNC BANK, NATIONAL ASSOCIATION,

        Plaintiff,

                                      Case Number 14-10527

v.                                      Honorable David M. Lawson

GOYETTE MECHANICAL COMPANY, INC.,
GOYETTE-WEST, INC., DOMINIC GOYETTE,
and DOMINIC T. GOYETTE TRUST DATED
AUGUST 26, 1998, AS AMENDED,

        Defendants.

_____/

## OPINION AND ORDER DENYING MOTION BY E.L. MECHANICAL, INC. TO AMEND AFFIRMATIVE DEFENSES AND GRANTING PNC BANK'S MOTION FOR SUMMARY JUDGMENT

PNC Bank commenced this lawsuit against joint borrowers Goyette Mechanical Company, Inc. ("Goyette Mechanical"), E.L. Mechanical, Inc. ("ELM"), and Goyette-West, Inc. seeking damages and appointment of a receiver, alleging that the defendants breached the terms of a line of credit note and restated term note. Presently before the Court is the Bank's motion for summary judgment and ELM's motion for leave to amend its affirmative defenses. The Goyette defendants do not contest the entry of summary judgment except as to the Bank's request for an award of attorney fees and costs for its defense of a lawsuit filed against the Bank by ELM's principal, Gerald Peguese. ELM has filed a response arguing that the loan documents are forged and Gerald Peguese signed the Cash Collateral Agreement under duress. The Court heard oral argument on the motions on August 12, 2015.

ELM did not raise its forgery claim in its affirmative defenses. However, it need not do so, because proper execution of the loan documents is an element of the Bank's claims for which it

carries the burden of proof. Therefore, it is not necessary for ELM to amend its affirmative defenses, and that motion will be denied. Nonetheless, there is no dispute of material fact that the defendants are liable to the Bank for the loan amounts, and the bank is entitled to summary judgment.

I.

According to the pleadings and the discovery materials filed with the motion papers, Goyette Mechanical Company, Inc. is a Michigan corporation that performs mechanical contracting work, including plumbing, heating, HVAC, and electrical installations. Dominic Goyette and two other shareholders — Cherie Parks and Paul Goyette — own and operate Goyette Mechanical. ELM is a Michigan corporation and minority owned company. Gerald Peguese, a non-party, initially owned 55 percent of ELM; on April 29, 2013, he became the sole shareholder of the company. Peguese also served as the president of ELM until it went out of business.

In 2009, Goyette Mechanical joined with ELM in a partnership to expand Goyette Mechanical's minority contracting work in Detroit. Under the partnership, Goyette Mechanical provided capital, equipment, tools, vehicles, employees, and administrative and accounting support to ELM. Goyette Mechanical also collected all of ELM's receivables, managed cash, and paid ELM's obligations, including payroll, subcontractors, suppliers, and loan obligations.

The partnership obtained its funding from plaintiff PNC Bank, which extended a $6 million line of credit and a $451,107 term loan to defendants ELM, Goyette Mechanical Company, Inc., and Goyette-West, Inc. as joint borrowers. The borrowers each executed a security agreement in favor of the Bank, dated June 13, 2012, to secure the repayment of the funds and all indebtedness. The collateral included all personal property of each borrower, including accounts, investment property,

-2-

deposit accounts, instruments, documents, chattel paper, inventory, goods, equipment, fixtures, general intangibles, cash, and proceeds of all property.  The Bank's security interest in the collateral was perfected when financing statements were filed with the Michigan Secretary of State on July 13, 2011 and September 13, 2012.  Dominic Goyette signed the loan, credit, and security documents on behalf of Goyette Mechanical and Goyette-West; Gerald Peguese signed them on behalf of ELM.

Additionally, Dominic Goyette personally guaranteed the payment of all loans, advances and liabilities that Goyette Mechanical and ELM owed the Bank up to $3.5 million.  Additionally, the Dominic T. Goyette Trust Dated August 26, 1998 ("the Trust") executed a guarantee without financial limitation.  The borrowers also executed various amendments to the loan documents, including a waiver and amendment to loan documents dated September 13, 2011; a second amendment to loan documents dated February 29, 2012; a waiver and third amendment to loan documents dated June 13, 2012; and a waiver and fourth amendment to loan documents dated June 21, 2013.  Dominic Goyette again signed the amendments on behalf of Goyette Mechanical and Goyette-West; Gerald Peguese again signed the amendments on behalf of ELM.

The loan documents required the borrowers to (1) maintain at all times a minimum Tangible Net Worth of $3.2 million beginning with the period ending September 30, 2011; and (2) maintain at all times a ratio of funded debt to earnings before interest, taxes, depreciation, and amortization (EBITDA) of less than 3.5:1 beginning with the period ending December 31, 2011.  Although the borrowers appear to have met these requirements for a few years, the relationship between ELM and Goyette Mechanical deteriorated in 2013 and, by September 30, 2013, the borrowers fell out of formula and thereby defaulted under their loan agreement with the Bank.  Soon thereafter the Bank sent the borrowers a notice of default and accelerated the indebtedness.

On February 4, 2014, the Bank filed a complaint in this Court against ELM, Goyette Mechanical, Goyette-West, Inc., Dominic Goyette, and the Trust for breach of the various notes and guarantees. The Bank also included a count of claim and delivery to take the collateral, and sought the appointment of a receiver.

The Court initially denied the Bank's motion to appoint a receiver and instead issued a preliminary injunction that was intended to restore the relationship of the borrowers to *status quo ante* — that is, before the falling out of Peguese and the Goyettes — and make the Bank secure. The preliminary injunction required the borrowers to, among other things, abide by the terms and conditions of a cash collateral agreement that had been signed on February 17, 2014, which ratified all of the loan documents, confirmed that the borrowers were in default under the terms of those documents, waived any defenses or set-offs, and renewed the guarantee and security agreements described above.

The preliminary injunction failed in its purpose. Goyette Mechanical accused ELM of misappropriating profits, failing to provide a complete accounting, and refusing to deposit funds into the cash collateral account in violation of the Court's order. ELM, in turn, accused Goyette Mechanical of using the authority of the injunction to cut off all funding for ELM's payroll and refusing to approve funding of the remaining work on a project with the Chrysler Jefferson North Assembly Plant ("JNAP") unless ELM agreed to disburse $650,000 to PNC Bank. And the Bank reported that while Goyette Mechanical and ELM bickered, their joint business operations appear to have ground to a halt and the Bank has not been paid.

On April 25, 2014, the Court appointed Russell Long as Receiver of the defendant's businesses: ELM, Goyette Mechanical, and Goyette-West. Since that time, the Receiver has been

marshaling the assets of the receivership entities, completing outstanding projects, collecting revenue, and paying creditors. Nevertheless, according to the Bank, as of May 12, 2015, the receivership entities owed a total of $3,862,330.11 under the Line of Credit Note ($3,858,390.64 in principal, $200 in late fees, and $3,739.47 in accrued and unpaid interest) and $286,169.90 under the Restated Term Note ($285,701.42 in principal and $468.48 in accrued and unpaid interest). The defendants do not dispute those facts. The Bank also says it has incurred $44,795.67 in consultant and field examination fees, attorney's fees in the amount of $210,148, and other legal costs in the amount of $1,211.01. The Bank argues in its motion that it is entitled to a judgment against all the defendants as a matter of law.

The Bank argues that the plain terms of the loan documents and the defendants' undisputed breach of those agreements make clear that it is entitled to summary judgment against the borrowers. It contends that the borrowers have defaulted under the notes and it is entitled to full and immediate repayment of all sums due and owing under the Line of Credit Note and the Restated Term Note. The Bank also argues that it is likewise entitled to full and immediate repayment under the Guaranties. It contends that both guarantor defendants also agreed to reimburse it for its costs and attorney fees incurred in the enforcement of the notes. Finally, the Bank contends that it is entitled to a judgment of possession and delivery of all remaining collateral identified in the loan documents.

The Goyette defendants do not contest the entry of summary judgment on the grounds the Bank asserts, with one exception. They dispute that they are responsible for the attorney's fees and costs the Bank incurred in its defense of the lawsuit known as *Peguese v. PNC Bank and Dominic Goyette*, originally filed in this Court (docket no. 15-10475), dismissed on May 6, 2015,

and re-filed in the Wayne County, Michigan circuit court on May 7, 2015 (docket no. 15-006100-CB). The Goyette defendants do not read the loan and guarantee documents as creating a responsibility on their part for those expenses.

ELM asserts for the first time in its response to the Bank's summary judgment motion that many of the loan documents are forged, and therefore summary judgment is not appropriate. ELM does acknowledge that it executed the Cash Collateral Account Agreement containing language asserting that ELM is liable as a borrower. However, ELM contends that its execution of that Agreement was obtained by duress, that is, under the threat that a criminal complaint would be filed against Peguese if he did not sign the Cash Collateral Account Agreement. ELM also argues that the Bank failed to administer the disbursements of the loan proceeds properly by failing to obtain ELM's signature on the following required documents: the borrowing base certificate; the borrowing base rider; and, possibly, the loan disbursement authorization.

The Bank responds that ELM did not raise forgery or duress as an affirmative defense and therefore those defenses are waived. Moreover, PNC contends that ELM's newfound allegations of forgery are directly contradicted by Peguese's prior admissions and do not create a genuine issue of fact.

## II.

It is true that "[a]s a general rule, failure to plead an affirmative defense results in a waiver of that defense." *Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005) (citing *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994)). And Civil Rule 8(c) states that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c). That begs the question, however, whether a claim that a signature on a loan

document was forged amounts to an "avoidance or affirmative defense" that must be asserted affirmatively.

Because the Bank's claims are based on state law — here in this Court under diversity jurisdiction — the Court must "look to Michigan state law to determine whether or not" forgery "is an affirmative defense for the purposes of Rule 8(c)." *Roskam Baking Co., Inc. v. Lanham Machinery Co., Inc.*, 288 F.3d 895, 901 (6th Cir. 2002) (collecting cases); *see also Miller v. Davis*, 507 F.2d 308, 317 n.7 (6th Cir. 1974) ("Thus, in a diversity case a state statute of limitations, for instance, must be followed, as well as a state rule determining when such an affirmative defense is considered waived. In both cases the state rules embody important substantive policies that transcend their role in judicial administration.") (internal citations omitted).  The Michigan cases do not provide much guidance, however.  There is one unpublished case from the intermediate appellate court, which states without any explication that forgery is an affirmative defense.  *Webb v. Greer*, No. 235424, 2003 WL 21675879, at *4 (Mich. Ct. App. July 17, 2003).  This Court's task, however, is to determine Michigan substantive law, as prescribed by the state's highest court.  *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  Because the Michigan Supreme Court has not addressed the question, the Court "must predict how it would resolve the issue from 'all relevant data.'"  *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995) (citing *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985)).  Relevant data can include "the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta*."  *Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674 (E.D. Mich. 2001) (internal quotation marks and citation omitted).

Michigan has a court rule that addresses affirmative defense pleading. Although that rule does not govern here, *see Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010) (plurality) (holding that if a Federal Rule "regulates procedure," "it is authorized by [the Rules Enabling Act, 28 U.S.C.] § 2072 and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights"), it does give insight into the types of defenses the state courts consider as "affirmative defenses." Those enumerated include "contributory negligence; the existence of an agreement to arbitrate; assumption of risk; payment; release; satisfaction; discharge; license; fraud; duress; estoppel; statute of frauds; statute of limitations; immunity granted by law; want or failure of consideration," and others. Mich. Ct. R. 2.111(F)(3)(a). Forgery is not included in the list, but that is not determinative, as the list is nonexclusive. *Citizens Ins. Co. of Am. v. Juno Lighting, Inc.*, 247 Mich. App. 236, 241, 635 N.W.2d 379, 382 (2001). Categorically, an affirmative defense "accepts the plaintiff's allegation as true and even admits the establishment of the plaintiff's prima facie case, but . . . denies that the plaintiff is entitled to recover on the claim for some reason not disclosed in the plaintiff's pleadings." *See Stanke v. State Farm Mut. Auto. Ins. Co.*, 200 Mich. App. 307, 312, 503 N.W.2d 758, 760 (1993); *see also Chmielewski v. Xermac, Inc.*, 216 Mich. App. 707, 712, 550 N.W.2d 797, 800 (1996) ("An affirmative defense is a defense that does not controvert the establishment of a *prima facie* case, but that otherwise denies relief to the plaintiff.").

Forgery does not fit neatly into that confession-and-avoidance category. Nonetheless, some courts have held, largely without explanation, that forgery is an affirmative defense. *E.g., DVI Fin. Servs., Inc. v. Kagan*, No. CIV. A. 00-CIV-1666, 2001 WL 706365, at *2 (E.D. Pa. June 21, 2001) ("[U]nder Pennsylvania law, forgery is an affirmative defense"); *Williams v. Walker*, No.

-8-

10-00-00303-CV, 2004 WL 691637, at *4 (Tex. App. Mar. 31, 2004) (referring to forgery as an affirmative defense); *Asia N. Am. Eastbound Rate Agreement v. Amsia Int'l Corp.*, 884 F. Supp. 5, 6 (D.D.C. 1995) (same); *Great Am. Ins. Co. v. Giardino*, 71 A.D.2d 836, 419 N.Y.S.2d 367, 368 (1979) (same); *McMurray v. Crawford*, 3 Kan. App. 2d 329, 330, 594 P.2d 1109, 1111 (1979) (same); *Barnes v. Boulevard Nat. Bank of Miami*, 124 So. 2d 494, 495 (Fla. Dist. Ct. App. 1960) (same).

Other courts, however, have held that forgery is not an affirmative defense because the existence of a contract is an essential element of a breach of contract claim, and if a signature on a contract is forged, it cannot signify a meeting of the minds, which is essential to a claim for breach. *See, e.g., R.C. Olmstead, Inc. v. GBS Corp.*, 2009-Ohio-6808, ¶ 38 ("[T]he defense of forgery does not fit the definition of an affirmative defense."); *Sherman Int'l Corp. v. Summit Gen. Contractors, Inc.*, 848 So. 2d 263, 268 (Ala. Civ. App. 2002) ("[F]orgery is not an affirmative defense because it is not external" to a breach of contract claim); *World Enterprises, Inc. v. Midcoast Aviation Services, Inc.*, 713 S.W.2d 606, 609 n.3 (Mo. Ct. App. 1986) ("'[I]n an action for damages for nonperformance of a written contract, if the contract was valid, but had in some way been discharged, that would be new matter; but, if it was forged, the forgery would not be new matter and need not be pleaded. A showing of forgery would be a showing that the alleged cause of action never existed, and hence is fully covered by a simple denial." (quoting *Cushing v. Powell*, 130 Mo. App. 576, 109 S.W. 1054, 1054 (1908))).

The latter cases are better reasoned. Under Michigan law, mutuality of agreement is an element of a breach of contract action. *Detroit Trust Co. v. Struggles*, 289 Mich. 595, 599, 286 N.W. 844, 846 (1939). If ELM can establish that Peguese's signature on the loan documents was

-9-

forged, it would negate an essential element of PNC's claim. *See Fed. Deposit Ins. Corp. v. Fedorov*, No. 10-11061, 2010 WL 2944569, at *4 (E.D. Mich. July 22, 2010) (finding that forgery defeats a breach of contract claim because, if true, there is no mutuality of agreement). Forgery, therefore, need not be pleaded as an affirmative defense because it is simply the negative aspect of the plaintiff's affirmative proof of a valid agreement, which is an essential element of its breach of contract claim.

Moreover, if forgery were an affirmative defense, the burden of proof would be shifted improperly to the defendant. Under Michigan law, "[t]he *burden is on plaintiffs* to show the existence of the contract sought to be enforced, and no presumption will be indulged in favor of the execution of a contract since, regardless of the equities in a case, the court cannot make a contract for the parties when none exists." *Hammel v. Foor*, 359 Mich. 392, 400, 102 N.W.2d 196, 200 (1960) (emphasis added) (citing *Eicholtz v. Grunewald*, 313 Mich. 666, 21 N.W.2d 914 (1946)). The burden of proof is on the defendant, however, to prove an affirmative defense. *Horvath v. Delida*, 213 Mich. App. 620, 629, 540 N.W.2d 760, 764 (1995) (holding that "[t]he party asserting an affirmative defense has the burden to produce evidence to support it; only after such evidence has been introduced does the burden shift to the plaintiff to produce 'clear and decisive evidence to negate' the defense."). Concluding that forgery is an affirmative defense would be inconsistent with the way Michigan allocates the burden of proof in contract cases.

Based on the weight of authority, and the language of Michigan's court rule, I believe that the state's highest court would conclude that forgery of a signature is not an affirmative defense to a breach of contract claim. Instead, it is a form of denying the allegation that the defendant executed the contract. The burden remains with the plaintiff to prove that the signature is genuine. In this

case, therefore, ELM has not waived the defense of forgery by failing to plead it as an affirmative defense.  And it follows that there is no need to amend its affirmative defenses. The motion will be denied.

III.

The Bank seeks summary judgment on its promissory note-based claims.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.*  (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin*

-11-

*Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). In his commentary on affirmative motions for summary judgment, Judge William Schwarzer explains:

-12-

> When the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute.  Thus, it must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim — by showing that it would be entitled to a directed verdict at trial.

William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnote omitted).

A.

The Bank seeks summary judgment on its claims against ELM for breach of the line of credit note (count I), breach of the restated term note (count II), and claim and delivery (count V).  To prevail, the Bank must show that it entered into a valid contract with ELM.  The elements of a valid contract in Michigan are "(1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."  *Thomas v. Leja*, 187 Mich. App. 418, 422, 468 N.W.2d 58, 60 (1990).  Once a valid contract has been established, the Bank then must prove (1) the terms of the contract, (2) breach of those terms by ELM, and (3) injury to the Bank resulting from the breach.  *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Platsis v. E.F. Hutton & Co., Inc.*, 642 F. Supp. 1277, 1309 (W.D. Mich. 1986)).

To establish that ELM signed the loan documents and entered into the contract, the Bank properly points to the pleadings.  In its answer to the complaint, ELM stated:

> Defendant *admits that* [*the*] *signature of its President* [Gerald Peguese] appears on page 7 of Exhibit E [the ELM Security Agreement].  On information and belief, one or more of the exhibits [to the complaint] *signed* by Defendant's president were not presented to the President in their entirety, but were presented by telefax and the only attachment was the signature page.

Answer to Compl. [dkt. #34] at ¶ 14 (emphasis added).  The exhibits to the complaint included the Working Cash, Line of Credit, Investment Sweep Rider; Amended and Restated Term Note;

-13-

Amended and Restated Loan Agreement; and four waivers and amendments to the loan documents. As ELM conceded in its answer to the complaint, Gerald Peguese signed these documents. Moreover, in its answer to the Goyette defendants' cross-claim, ELM admitted "that it jointly borrowed funds with Goyette Mechanical from PNC Bank."  Answer to Cross-claim [dkt. #51] at ¶ 24.

Those statements in the pleadings *in this case* amount to judicial admissions, *Ahghazali v. Sec'y of Health & Human Servs.*, 867 F.2d 921, 927 (6th Cir. 1989), which "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact," *Cadle Co. II v. Gasbusters Prod. I Ltd. P'ship*, 441 F. App'x 310, 312-13 (6th Cir. 2011) (quoting *In re Fordson Eng' Corp.*, 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982)); *see also Ferguson v. Neighborhood Housing Services*, 780 F.2d 549, 551 (6th Cir.1986) (holding that "under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court" (citations omitted)).  A judicial admission renders a fact "uncontested" in a summary judgment proceeding.

Although ELM has not said so explicitly, its motion to amend its affirmative defenses (discussed above) to plead forgery can also be read to include a request to retract its admissions. Certainly, a party may change its position in a case by amending its pleadings.  And Civil Rule 15(a)(2) says that "a court should freely give leave when justice so requires."  But the rule's generous leave-granting theme has its limits: leave may be denied "in instances of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of

-14-

the amendment, [or] futility of amendment.'" *Glazer v. Chase Home Fin., LLC*, 704 F.3d 453, 458

(6th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

      The Bank argues that the Court should reject ELM's attempt to back out of its admissions,

since it now seeks to change its position only when faced with a motion for summary judgment.  The

Bank points to undue delay by ELM and prejudice to itself.  "Delay alone will ordinarily not justify

the denial of leave to amend; however, delay will at some point become 'undue,' 'placing an

unwarranted burden on the court,' or 'prejudicial,' 'placing an unfair burden on the opposing

party.'" *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 347 (6th Cir. 2007)

(quoting *Morse v. McWhorter*, 209 F.3d 795, 800 (6th Cir. 2002)).  "At least one Sixth Circuit

decision has held that allowing amendment after the close of discovery creates significant prejudice,

and other Circuits agree." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)

(collecting cases).

      It is difficult to avoid characterizing ELM's recent allegations of forgery as a bad-faith

attempt to change its position in this litigation.  ELM has provided no justification for why it first

admitted to signing the loan documents, but now contends that those loan documents were forged.

Wouldn't ELM have known from the onset of the litigation whether it signed the loan documents?

Could there be a reasonable explanation why ELM waited until after the close of discovery and the

dispositive motion deadline to request an amendment?  ELM has not begun to supply a plausible

answer to these questions.  Moreover, allowing ELM to retract its prior admissions would

significantly prejudice the plaintiff.  The Court would have to reopen discovery as to the authenticity

of Peguese's signatures, possibly allow the Bank to retain a handwriting expert, entertain the

likelihood of additional motion practice, and possibly unwind the extensive activity of the Receiver.

Additionally, the amendment would be futile. Aside from the pleadings, ELM has repeatedly admitted that Peguese signed the loan documents. For instance, in a July 17, 2014 email to the Bank, Peguese stated:

> Dominic Goyette and GMC increased their financing capabilities with PNC [B]ank by increasing its line of credit to $6,000,000.00. It did this on the back of ELM. Mr. Peguese was required to sign all loan documents on behalf of ELM, however not personally. Mr. Peguese was reluctant to sign these documents but was given no choice . . . he was threatened that all financing would be cancelled if he did not sign.

Reply to Resp. to Mot. for Summ. J. [dkt. #209], Ex. P. Additionally, Peguese admitted in his response brief that he signed the Cash Collateral Agreement. In that agreement, Peguese admitted that he "executed and delivered to the Bank" twelve loan documents that are enumerated in an attachment to the agreement. *See* Mot. Dismiss Counterclaim, Ex. O [dkt. #45-16] at 2 ¶(A), 9. The twelve documents include the Line of Credit Note, Restated Term Note, Loan Agreement, ELM Security Agreement, and four waivers and amendments. In the Cash Collateral Agreement, ELM certified that "all of its representations and warranties" in those documents are "true and correct." Mot. Summ. J., Ex. M [dkt. #200-14] ¶ B(2). He also "ratified and confirmed [the representations in those documents] without condition as if made anew." *Ibid.* ELM also confirmed that its obligations under the loan documents "remain outstanding without defense, set off, counterclaim, discount or charge of any kind as of the date of this Agreement." *Ibid.* ELM affirmed its obligations on at least four earlier occasions as well. *See id.* Ex. J [dkt. #200-11] at 2 ¶ B(2); 5 ¶ B(2); 13 ¶ B(2); 22 ¶ B(2).

There is no *genuine* dispute on the present record that Gerald Peguese signed the loan documents on behalf of ELM.

B.

Taking another tack, ELM now argues that it signed the Cash Collateral Agreement under economic duress. The main premise of that argument appears to be that Peguese was threatened with a criminal complaint and criminal contempt unless he signed the Cash Collateral Agreement. The defendant's explanation of that defense in its own words is:

> Gerald Peguese was told that if he did not sign the Cash Collateral Agreement and place the funds in the PNC account controlled by GMC [Goyette Mechanical Company], a criminal complaint and criminal contempt. Hence duress.

Br. in Opposition to Mot. for Summ. J. [dkt. #205] at 8. A complete sentence would help develop this argument, but not as much as some record facts that tended to show that Peguese's will was overborne when he put pen to paper on the Cash Collateral Agreement. As it is, the argument fails as a matter of law. "Duress requires compulsion or coercion by which one is illegally forced to act by fear of serious injury to person, reputation or fortune." *Apfelblat v. Nat'l Bank Wyandotte-Taylor*, 158 Mich. App. 258, 263, 404 N.W.2d 725, 728 (1987) (citing *Norton v. State Highway Dep't*, 315 Mich. 313, 319, 24 N.W.2d 132 (1946)). "In order to void a contract on the basis of economic duress, the wrongful act or threat must deprive the victim of his unfettered will." *Hungerman v. McCord Gasket Corp.*, 189 Mich. App. 675, 677, 473 N.W.2d 720, 721 (1991) (citing *Barnett v. International Tennis Corp.*, 80 Mich. App. 396, 406, 263 N.W.2d 908 (1978)). "Further, the party threatened must not have an adequate legal remedy available." *Ibid.*

ELM's argument in its brief notwithstanding, there is simply no evidence that the Cash Collateral Agreement was signed under duress. On February 14, 2014, the Court held a hearing on the plaintiff's and the Goyette defendants' motion to appoint a receiver (which ELM did not oppose). At the close of the hearing, the Court informed the parties of its intention to issue an

-17-

injunction and directed them to draft language upon which they agreed. The parties worked together to draft the Cash Collateral Agreement with the input and assistance of ELM's attorney. On February 17, 2015, ELM signed the Cash Collateral Agreement and, until it filed a response to the Bank's motion for summary judgment, made no allegations of duress or impropriety. ELM's argument lacks factual support, and is meritless.

ELM also argues that it had no choice but to sign the loan documents because the Bank threatened to cut off all financing. However, "[f]ear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully." *Apfelblat*, 158 Mich. App. at 263, 404 N.W.2d at 728. Moreover, "a creditor may properly warn of his intentions to pursue collections without being subject to a defense of duress." *Ibid.* (citing *Hackley v. Headley*, 45 Mich. 569, 576, 8 N.W. 511 (1811). ELM could have refused to sign the loan document, but chose to sign it instead. There is no evidence that ELM signed the document under duress.

ELM has offered no evidence that the loan documents were forged, except for Peguese's self-serving allegations in his affidavit, which contradict ELM's pleadings. There is nothing in the record that supports his bare assertions, such as a statement from a questioned documents expert offering signature comparisons, or evidence that Peguese was out of the state on the date the loan documents were signed, or something that might call into question the authenticity of Peguese's signatures. More importantly, however, as discussed earlier, the question has been settled by ELM's judicial admission. A defendant is "bound by admissions in [its] pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit." *Hughes v. Vanderbilt Univ.*,

-18-

215 F.3d 543, 549 (6th Cir. 2000) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

C.

Finally, ELM argues that the Bank is not entitled to summary judgment because ELM did not sign certain other documents, such as the borrowing base certificate, the borrowing base rider, and the loan disbursement authorization.

As to the borrowing base rider, ELM is incorrect. Peguese's signature appears on the document along with the signatures of Cherie Parks, Dominic Goyette, and Fred Mitchell. The borrowing base certificate, however, is another matter.

The borrowing base certificate is a document that was attached to the borrowing base rider. The certificate lists ELM's available collateral, assets, and inventory. ELM is correct that it did not sign the borrowing base certificate. However, the certificate did not grant ELM any rights or remedies. Instead, completion of the certification would have allowed the Bank to ascertain the defendants' resources in the event of default. Moreover, there is no provision in any of the other loan documents that made them effective only if the Bank secured ELM's signature on the borrowing base certificate. ELM's argument that the Bank cannot enforce the loan documents because it did not sign the borrowing base certificate finds no support in any of the other loan documents.

ELM also suggests that the Bank may not have obtained its authorization on the loan disbursement documents. However, the parties' loan documents did not require separate disbursement authorizations, because disbursement was automatic each day under the terms of the Working Cash Rider — a document ELM signed.

-19-

There is no genuine dispute that ELM signed the loan documents, ELM breached the agreements, or that PNC is entitled to enforce its rights under the loan documents. ELM has not tendered any evidence that establishes a genuine issue of material fact on its liability to the Bank under the term loan or line of credit. The Bank is entitled to judgment as a matter of law against ELM on counts I, II, and V of the complaint.

### D.

The Goyette defendants do not oppose summary judgment in general, but they do object to one element of the damages asserted by the Bank. The Bank is seeking reimbursement for attorney's fees and costs it has incurred in defending a lawsuit brought by Gerald Peguese in this Court and then refiled in the Wayne County, Michigan circuit court after Peguese's federal case was dismissed. The Goyette defendants contend that the expenses do not relate to the loans, and a proviso in the loan documents' broad indemnity paragraph shields them from having to protect the Bank from the expenses of those lawsuits.

The indemnity language obligates the borrowers to indemnify the Bank for "all claims, damages, losses, liabilities and expenses . . . in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents . . . arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise . . . ." But the paragraph does not cover "any claims, damages, losses, liabilities and expenses solely attributable to an Indemnified Party's gross negligence or willful misconduct."

Peguese's lawsuit in this Court alleged that the Bank failed to provide ELM with a complete set of the loan documents, only furnished ELM with a telefaxed signature page of the loan

-20-

documents, and failed to provide ELM with the documentation needed to stay informed about its borrowing base.  Peguese alleged further that, in order to pay down the bank loan, Goyette Mechanical filed a false insurance claim in ELM's name for work done at the Jefferson North Assembly Plant, misappropriated $83,214.90 in the form of a check from O'Brien Construction, and used his electronic signature fraudulently to obtain $115,000 from ELM's Charter One bank account.  Additionally, Peguese alleged that Dominic Goyette interfered with ELM's contractual relationship with Chrysler, its largest customer, by insisting that approximately $3 million that it owed ELM should be paid to the Bank.  And Peguese alleged that the Bank and Goyette Mechanical misled ELM about whether it was jointly and severally liable for the entire loan amount.  Peguese filed an amended complaint, which contained most of the same factual allegations.  He accused the Bank of wrongfully interfering with a contractual relationship ELM had with Chrysler, and aiding and abetting and conspiring with Dominic Goyette to destroy Peguese's reputation.  Neither party has supplied the Court with the state court complaint, but based on their arguments it appears that the allegations track Peguese's dismissed federal lawsuit.

It does appear that Peguese has alleged in his lawsuits that the Bank has engaged in "intentional misconduct."  *See Nationwide Mut. Fire Ins. Co. v. Detroit Edison Co.*, 95 Mich. App. 62, 65-66, 289 N.W.2d 879, 881 (1980) (defining willful misconduct as "'an intentional wrong or a reckless and heedless disregard to another's safety'" (quoting *Papajesk v. Chesapeake & Ohio R. Co.*, 14 Mich. App. 550, 555, 166 N.W.2d 46, 48 (1968))).  Knowledge and intent are elements of fraud, civil conspiracy, and aiding and abetting.  *See Health Call of Detroit v. Atrium Home & Health Care Servs.*, Inc., 268 Mich. App. 83, 90, 706 N.W.2d 843, 849 (2005) (intent is an element of tortious interference with business expectancy);  *M&D, Inc. v. W.B. McConkey*, 231 Mich. App.

-21-

22, 27, 585 N.W.2d 33, 36 (1998) (explaining that knowledge or recklessness is an element of fraud); *El Camino Res. Ltd. v. Huntington Nat. Bank*, 712 F.3d 917, 922 (6th Cir. 2013) (finding that, if faced with the opportunity, the Michigan Supreme Court would find that aiding and abetting a tort would, among other elements, require knowledge of wrongful conduct by the aider and abetter and substantial assistance of the wrongful conduct by the aider and abetter).

That is beside the point, however, because the defendants signed a subsequent agreement (that was incorporated into each of the loan documents) in which they promised "to indemnify . . . the Bank . . . from any loss, damage, judgment, liability or expense (including attorney's fees) suffered by or rendered against the Bank or any of them on account of any claims arising out or relating to the[ir] Obligations" to the Bank under the loan documents. See Mot. for Summ. J., Ex. M (Cash Collateral Agreement) [dkt. #200-14] ¶ 5. This separate indemnity provision is not limited by the proviso language. Therefore, the defendants' indemnity obligation extends to expenses due to "claims arising out or relating to" the "Obligations," which are defined to include all the loans and extensions of credit.

The Goyette defendants contend, however, that the Peguese lawsuits do not relate to the loans. In light of the allegations in Peguese's complaints, that is a difficult position to sustain. The essence of the claims is that the Goyette interests lured Peguese and his companies into a partnership, obtained funding from the Bank, and then engaged in various unlawful acts in an effort to pay down the loan obligations at the expense of Peguese's businesses and reputation. The conduct Peguese complained about was caused by — that is, it *arose from* — the loans and the efforts to repay them. *See Empire Fire & Marine Ins. Co. v. Minuteman Intern., Inc.*, 2008 WL 142424, at *2 (Mich. App. Jan. 15, 2008) (stating that "[t]he phrase 'arising out of' has been defined

in different contexts, but generally requires a causal connection"); *see also People v. Johnson*, 474 Mich. 96, 101, 712 N.W.2d 703 (2006) (observing that the phrase "'arising out of' . . . suggest[s] a causal connection between two events of a sort that is more than incidental").

Nor does it matter that Peguese was not a party to any of the loans or lines of credit extensions. The broad indemnity language does not limit borrowers' obligations to expenses that "arise from" their own conduct. And the breadth of the indemnity does not render it ambiguous. "[T]he fact that a term is broad in scope does not necessarily make it ambiguous." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001); *see also Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014) (explaining that a contract is not ambiguous simply because it could have been more specific); *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 801 (D.C. Cir. 2004) ("That the term is broad does not make it ambiguous.")

The expenses — costs and attorney's fees — incurred by the Bank in defending the Peguese lawsuits fall within the defendant's contractual obligation to indemnify.

IV.

There is no genuine issue of material fact that would preclude summary judgment for the plaintiff Bank against all of the defendants. The Bank is entitled to summary judgment against the respective defendants on counts I (breach of line of credit note), II (breach of restated term note), III (breach of Dominic Goyette guaranty), IV (breach of Goyette Trust guaranty), and V (claim and delivery) of its complaint. None of the defendants disputed the amount of damages claimed by the Bank, save the Goyette defendants' objection to part of the indemnity claim, discussed above. However, because of the lapse of time between the motion filing and this decision, and the inevitable

accrual of interest on the defaulted loan debts, updated information on the amounts owing currently will be needed before judgment can enter.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt. #200] is **GRANTED**.

It is further **ORDERED** that E.L. Mechanical, Inc.'s motion to amend its affirmative defenses [dkt. #214] is **DENIED**.

It is further **ORDERED** that the plaintiff must submit an affidavit stating the amounts currently owing under the loan obligations described in its summary judgment motion. The affidavit must be submitted no later than **October 26, 2015**, and should fix the amount owed as of **October 30, 2015**. If any party disputes the amount claimed, it must file a counter-affidavit detailing the basis of its disagreement **on or before October 29, 2015**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   October 22, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 22 2015.

/s Susan Pinkowski
SUSAN PINKOWSKI